Filed 1/9/23 P. v. Scott CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C095679 |
| Plaintiff and Respondent, | (Super. Ct. No. 04F11184) |
| v. | |
| DEANDRE CERRONE SCOTT, | |
| Defendant and Appellant. | |

Defendant Deandre Cerrone Scott appeals from the trial court's order denying his petition for resentencing under former Penal Code[1] section 1170.95 (now section 1172.6).[2] Defendant was originally convicted of first degree felony murder for a killing in 2004 occurring during a robbery. The trial court held an evidentiary hearing on

---

[1] Undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

1

defendant's petition and concluded beyond a reasonable doubt defendant had been a major participant in the robbery and had acted with reckless indifference to human life. On appeal, defendant contends these conclusions lack substantial evidence. We will affirm.

BACKGROUND

A.  *Defendant's Trial*

Defendant was charged with the murder of Larry Elliott, Jr. At defendant's trial, J. Willis testified to being in Elliott's garage, along with G. Porter, the night of December 9, 2004, when codefendant Danny Hampton called to buy some cannabis from Elliott. Ten to 20 minutes later, Hampton and codefendant Cammitt Doughton walked into the garage and discussed buying cannabis from Elliott. About seven minutes later, two masked men entered the garage and one pointed a gun at Willis, which Willis believed was a large "Old Western[]" style revolver. Willis heard Elliot being hit with a gun and yell in pain, "Stop, y'all are killing me" and one of the men asked, "[W]here's the money? Where's the weed? Where's the keys to his car?" Elliott screamed he didn't have any money because he had spent it all on a truck. Willis also heard someone say, "If you say another word, I'm gonna shoot you," and saw the second masked man enter the home.

Willis eventually saw Hampton and the two other men run out of the garage but Doughton stayed back and said aggressively, "I told you not to look up." Willis then heard a gunshot and Doughton told Willis not to say anything before Doughton left the garage. There were about seven seconds between the time the three men ran out of the garage and the gunshot was heard. Willis then ran out of the garage in the opposite direction of the men but could see four men going the other way "pretty much like a pack" toward the park.

H. Mackelvie, who lived with Elliott and their one-year-old son, testified that on the night of December 9, 2004, at around 10:00 p.m., she was half asleep when someone came in from the garage and put a gun to her head, telling her to get on the floor and not

2

look up. Mackelvie was later able to identify this man as Doughton. She also believed this gun was semiautomatic because it did not have a revolving chamber.

As Mackelvie was going to lie down, she was able to look to her side and saw another man going into the bedroom and could hear him opening drawers, tossing through things, and making a mess. She believed she saw a gun in the hand of this man as well. Doughton kept asking her, "Where are the keys? Where's the money?" Doughton was also going into the garage making similar demands three to four times, stating, "Where's the fucking keys? Where's the fucking money?" She also heard Doughton yell in the garage, "If somebody doesn't tell me where the fuck the money is, somebody is gonna get popped," which she understood to mean shot. Mackelvie could also hear Elliott say in the garage, "I don't have anything."

Mackelvie gave Doughton the money in her purse, which was about $140. But both men in the house were still yelling back and forth asking where the money was. She was eventually able to escape through the front door when Doughton returned to the garage. She said the entire ordeal lasted seven to 10 minutes.

K. Turner, the partner of codefendant Edward Quintanilla, testified at defendant's original trial to seeing all of the codefendants — Quintanilla, Hampton, Doughton, and defendant — at a hotel room on the night of December 9, 2004. Turner then drove Quintanilla and Doughton from the hotel to a park about 15 minutes away while defendant separately drove Hampton there. Once at the park, Doughton and Hampton got out of the cars and said they were "going up to the house and said they would call when they knew the guy was there"; they then walked out of sight. Turner waited at the park with Quintanilla and defendant until Quintanilla got a phone call. Quintanilla said something like, "We'll be right there," and he and defendant walked in the same direction of the other two men. Turner estimated that between 10 and 20 minutes later, the four men came running back to the car, and then both cars left. In the car after they left, Turner heard Quintanilla ask, "Who capped him?"

3

Turner also testified at defendant's trial that she did not hear defendant really say anything throughout the night. But she acknowledged she testified at Hampton's trial that Quintanilla and defendant were directing the other two men on what to do and where to go and that it was defendant mostly doing the directing. She had also testified at that trial that after the park, she and the four men went back to the hotel and she observed the men looking like just "average guys" talking like friends.

Elliott died from a gunshot wound to his head and he also had trauma to the head, including tearing of the skin, consistent with being hit with a gun.

Defendant stipulated at trial that he was located in Arizona on February 3, 2006, and "transported to Sacramento for purposes of this case."

The jury found defendant guilty of first degree murder and robbery. Defendant appealed his conviction, which we affirmed. (*People v. Scott* (Mar. 18, 2010, C059310) [nonpub. opn.].)

### B. Senate Bill No. 1437 and Defendant's Petition

In 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) was enacted to "amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill 1437 achieves these goals by amending section 188 to require that a principal act with express or implied malice (§ 188, as amended by Stats. 2018, ch. 1015, § 2), and by amending section 189 to state that a person can be liable for felony murder only if: (1) the "person was the actual killer"; (2) the person, with an intent to kill, was an aider or abettor "in the commission of murder in the first degree"; or (3) the "person was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e), as amended by Stats. 2018, ch. 1015, § 3.)

4

Senate Bill 1437 also added former section 1170.95 to provide the resentencing petition process for a "person convicted of felony murder or murder under a natural and probable consequences theory." (Former § 1170.95, subd. (a).) If a trial court finds a petitioner has made a prima facie case for relief, it shall issue an order to show cause and hold an evidentiary hearing on the petition. (§ 1172.6, subds. (c), (d).) At the evidentiary hearing, it is the prosecutor's burden "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189." (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

In 2019, defendant filed a petition for resentencing under Senate Bill 1437. The trial court issued an order to show cause and held an evidentiary hearing on the petition in February 2022. After argument by both parties, the trial court summarized the facts from the prior trial testimony it found significant, including: defendant at least knew there were guns used; he knew Doughton put a gun to Mackelvie's head; one of his companions threatened to kill someone if not given money or cannabis; there is evidence defendant possessed a gun; violence was used against Elliott at the beginning of the robbery; though defendant may have been outside of the garage when the fatal shot was fired, he had not yet reached a place of safety so the robbery was still ongoing; defendant heard the gunshot but continued to run; and defendant "was directing traffic what to do, how to do it." From these and other facts, the trial court concluded beyond a reasonable doubt defendant was a major participant in the robbery who acted with reckless indifference to human life, so defendant's petition was denied.

## DISCUSSION

Under Senate Bill 1437, defendant is entitled to be resentenced if he was not the actual killer, did not have the intent to kill, nor was a major participant who acted with

5

reckless indifference to human life. The trial court found beyond a reasonable doubt defendant was both (1) a major participant in the robbery and (2) acted with reckless indifference to human life. Defendant contends these findings lack substantial evidence. We analyze both elements separately and find substantial evidence for each.

A.    *Standard of Review*

" 'When reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence — that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.' [Citation.]" (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) " If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. " (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

B. *Major Participant*

For a defendant to be a "major participant," his "personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*People v. Banks* (2015) 61 Cal.4th 788, 802 (*Banks*).) Our Supreme Court discerned several factors relevant in determining whether a defendant was a major participant in the underlying felony: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id*.

6

at p. 803, fn. omitted.) The court clarified, "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Ibid*.)

We find there is substantial evidence for defendant being a major participant in the robbery here. Most telling, Turner said defendant seemed to be the one directing the others. This is supported by the evidence defendant planned the robbery with the three other men shortly beforehand in the hotel and then drove Hampton to the park to execute the plan. Defendant also initiated the robbery by charging the garage with Quintanilla, and the evidence indicates defendant was the individual ransacking the bedroom looking for money and drugs. Furthermore, there is also evidence defendant had a gun and he must have known Doughton and Quintanilla did as well given his proximity to them when they brandished and threatened the victims with their guns.

Defendant was also at the scene of the murder and could have prevented it, or at least made it less likely. Defendant had started leaving the scene when Doughton stayed back and shot Elliott. Instead of staying back with his codefendant who was armed and had expressed a potential willingness to kill, defendant chose to flee. At the time Doughton fired the fatal shot, defendant had left on foot only seven seconds earlier. And Willis, who left after Doughton and defendant, could still see the men running down the street, having not yet reached the park. Defendant therefore was still on the scene and participating in an active robbery when he heard the gunshot fired by his codefendant, but decided to keep running instead of potentially rendering lifesaving aid to a gunshot victim.

Defendant also made no attempt to restrain Doughton. Given defendant's proximity to Mackelvie and her testimony, defendant presumably heard Doughton threaten Mackelvie with a gun to her head, providing defendant notice Doughton both

7

possessed a gun and was willing to threaten one's life. Yet, defendant failed to stop Doughton from staying back and ultimately killing Elliott.

This evidence collectively indicates defendant was much more than a mere getaway driver, and instead played an integral part in the planning and execution of the robbery that resulted in the killing of Elliott. (Compare *Banks, supra*, 61 Cal.4th at p. 807 [finding a getaway driver who did not participate in any other capacity was not a major participant].) Thus, there is substantial evidence supporting the trial court's finding that defendant was a major participant.

### C. Reckless Indifference

The requirements of being a major participant and acting with reckless indifference " 'significantly overlap . . . in general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).) Regarding the mental component of culpability, what matters is "whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' " (*Banks, supra*, 61 Cal.4th at p. 801.) Participation in a " 'garden-variety' " armed robbery, by itself, is not enough to establish reckless indifference. (*Clark*, at p. 617, fn. 74.) Instead, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, at p. 801.)

Reckless indifference has a subjective and an objective element. (*Clark, supra*, 63 Cal.4th at p. 617.) As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known

8

to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement. (*Banks*, at p. 808.) Thus, "the fact a participant in [or planner of] an armed robbery could anticipate lethal force might be used" is not sufficient to establish reckless indifference to human life. (*Ibid*.; see *Clark*, at p. 623.)

Our Supreme Court has also provided relevant factors in analyzing "the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life," which include: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? (*Clark, supra*, 63 Cal.4th at pp. 618-623.) ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

There are several important facts elevating this armed robbery beyond a typical armed robbery into one that created a knowing grave risk of death. Initially, there were explicit threats to life prior to the fatal shot that put defendant on notice of his cofelon's potential for life threatening violence. (*Clark, supra*, 63 Cal.4th at p. 621 ["Defendant's knowledge of [a cohort's likelihood of killing] may be evident before the felony or may occur during the felony"].) Right after Quintanilla and defendant entered the garage, Elliott was hit in the head with a gun so hard that it tore his skin. Elliott yelled they were going to kill him if the attackers did not relent. Shortly after this, Doughton put a gun to

9

Mackelvie's head. Defendant baselessly asserts that "Doughton did not threaten to kill Mackelvie," but there are few, if any, acts more threatening to life than having a firearm put to one's head, being a mere flex of a finger away from likely death. Mackelvie also heard Doughton say in the garage he was going to shoot someone. Defendant was in the house with Mackelvie, so defendant presumably heard and witnessed the same explicit verbal and physical threats to life that Mackelvie did, and yet he did nothing.

There were also multiple firearms used. Quintanilla had a revolver and Doughton had a semiautomatic pistol. Most importantly, Mackelvie testified to seeing defendant have a gun when he went into the bedroom.[3] The number of firearms increased the risk of death beyond a simple armed robbery with only one firearm. And defendant's possession of one of these firearms confirms his willingness to accept the grave risk of death brought by a robbery with three firearms.

Defendant was nearby during the killing and had an opportunity to attempt to save Elliott. And given Doughton's previous threats on life, defendant was on notice for Doughton's potential for violence and his possession of a firearm, and yet he chose not to restrain Doughton at any point in the robbery, including when Doughton chose to stay behind while still armed. Defendant instead chose to flee, leaving Doughton behind, and continued to flee after hearing the gunshot, ignoring the possibility there was a gunshot victim requiring aid. He not only fled the scene, but helped Hampton flee and then defendant fled the state, being located in Arizona over a year later. And shortly after the shooting, Turner saw defendant with the other men acting normal, talking like friends. Defendant's actions after the shooting exhibit a lack of surprise and remorse someone

---

[3] Defendant contends in his opening brief there is no evidence he "had a firearm during the commission of the crime," but then his reply brief states, "[a]dmittedly, appellant had a firearm." Regardless of defendant's position, Mackelvie's testimony is reliable evidence defendant did possess a gun.

was shot during the robbery, which further indicates an acceptance of the violent nature of the robbery. (*In re Scoggins, supra*, 9 Cal.5th at p. 679 ["A defendant's actions after the shooting may also bear on the defendant's mental state"].)

Finally, the robbery was not a brief one, with Turner testifying it could have been up to 20 minutes. This was plenty of time for defendant to deescalate the violence or disassociate from the robbery that was violent from its inception. Instead, he continued to participate in and support the violent robbery that resulted in Elliott's death. (*Clark, supra*, 63 Cal.4th at p. 619 [" 'If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders' "].)

The totality of the circumstances indicates defendant knowingly created a grave risk of death through his participation in the armed robbery of Elliott. Consequently, there is substantial evidence supporting the trial court's finding defendant acted with reckless indifference to human life.

## DISPOSITION

The judgment is affirmed.

_____/s/_____
BOULWARE EURIE, J.

We concur:

_____/s/_____
DUARTE, Acting P. J.

_____/s/_____
RENNER, J.

11